# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **ZAKARIA ABDELMAGEED ET AL.** | **CIVIL ACTION** |
| **VERSUS** | **No. 17-516** |
| **BOARD OF SUPERVISORS OF THE SOUTHERN UNIVERSITY SYSTEM** | **SECTION I** |

## ORDER & REASONS

Plaintiffs Zakaria Abdelmageed ("Abdelmageed") and Habbiburrahman Ansari ("Ansari") are Muslim academics who filed this lawsuit alleging that they were denied employment at the Southern University of New Orleans ("SUNO") on the basis of their religion[1] in violation of Title VII of the Civil Rights Act of 1964. R. Doc. No. 1, at 5. Before the Court is defendant's motion for summary judgment. R. Doc. No. 20. For the following reasons, the motion is granted.

## I.

Summary judgment is proper when, after reviewing the pleadings, the discovery and disclosure materials on file, and any affidavits, the court determines that there is no genuine dispute of material fact. *See* Fed. R. Civ. P. 56. "[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

---

[1] Counsel for the plaintiffs has clarified that the plaintiffs' allegations of employment discrimination should be construed as claims of religious discrimination only. *See* R. Doc. No. 27.

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case. *Id.*; *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1195 (5th Cir. 1986).

Once the party seeking summary judgment carries its burden, the nonmoving party must come forward with specific facts showing that there is a genuine dispute of material fact for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The showing of a genuine issue is not satisfied by creating "'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by only a 'scintilla' of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations omitted). Instead, a genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Although the substance or content of the evidence submitted to support or dispute a fact on summary judgment must be admissible . . ., the material may be presented in a form that would not, in itself, be admissible at trial." *Lee v. Offshore Logistical and Transp., LLC*, 859 F.3d 353, 355 (5th Cir. 2017) (quotation omitted).

The party responding to the motion for summary judgment may not rest upon the pleadings but must identify specific facts that establish a genuine issue. *Anderson*, 477 U.S. at 248. The nonmoving party's evidence, however, "is to be believed, and all justifiable inferences are to be drawn in [the nonmoving party's] favor." *Id.* at 255; *see also Hunt v. Cromartie*, 526 U.S. 541, 552 (1999).

## II.

Title VII makes it unlawful for an employer "to fail or refuse to hire . . . any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may prove a Title VII violation by using either direct or circumstantial evidence. *Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). When, as here, circumstantial evidence is used, the three-part, burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792 (1973), applies. *Id.*

Under the *McDonnell Douglas* framework, the plaintiff must first establish a prima facie case of discrimination. *Id.* If the plaintiff can make a prima facie case, a presumption of discrimination arises, and the defendant bears the burden of producing a legitimate, non-discriminatory reason for its employment decision. *Id.* If the defendant provides such a reason, the burden shifts back to the plaintiff, who, at the summary judgment stage, must raise a genuine dispute of material fact as to whether the defendant's proffered reason is merely pretext for discrimination. *See Medina v. Ramsey Steel Co., Inc.*, 238 F.3d 674, 680 (5th Cir. 2001).

To establish a prima facie case of discrimination, "[t]he plaintiff must prove by a preponderance of the evidence that [he] applied for an available position for which [he] was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). For example, in a failure-to-hire case such as this, a plaintiff

may establish a prima facie case of discrimination by showing that "(1) he belongs to a protected class; (2) he applied for and was qualified for a position for which applicants were being sought; (3) he was rejected; and (4) a person outside of his protected class was hired for the position." *See Burrell v. Dr. Pepper/Seven Up Bottling Grp., Inc.*, 482 F.3d 408, 411 (5th Cir. 2007). This burden "is not onerous." *Burdine*, 450 U.S. at 253.

Likewise, when faced with a prima facie case, a defendant employer has the rather light burden of rebutting the presumption of discrimination by pointing to any legitimate, non-discriminatory reason for its actions. "This burden . . . is only one of production, not persuasion, involving no credibility assessments." *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 222 (5th Cir. 2000). "The defendant need not persuade the court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff." *Burdine*, 450 U.S. at 254 (citation omitted).

If the employer provides a sufficient explanation for its hiring decision, it then falls to the plaintiff to "produce *substantial evidence* indicating that the proffered legitimate nondiscriminatory reason is a pretext for discrimination." *Laxton*, 333 F.3d at 578 (emphasis added). In producing such evidence, the plaintiff "must rebut each nondiscriminatory reason articulated by the employer." *Id.*

A plaintiff may establish pretext "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence.'" *Id.* However, "[e]vidence that the proffered reason is

4

unworthy of credence must be enough to support a reasonable inference that the proffered reason is false; a mere shadow of doubt is insufficient." *Bauer v. Albemarle Corp.*, 169 F.3d 962, 967 (5th Cir. 1999) (quotation omitted). Hence, "[i]n response to motions for summary judgment, it is . . . incumbent upon the non-moving party to present *evidence*—not just conjecture and speculation—that the defendant . . . discriminated against plaintiff on the basis of [his protected status]." *Grimes v. Texas Dep't of Mental Health and Mental Retardation*, 102 F.3d 137, 140 (5th Cir. 1996) (emphasis added).

## IV.

This case contains two distinct allegations of employment discrimination. The first involves both Abdelmageed and Ansari and relates to SUNO's hiring practices in mid-2014. The second involves only Ansari and relates to SUNO's hiring practices in late 2014 and early 2015. The Court considers each in turn.

## A.

In May 2014, Abdelmageed and Ansari each applied for one of three open, tenure-track assistant professor positions in the Department of Natural Sciences at SUNO. The initial search was conducted by a hiring committee made up of professors from the department. During the course of the search, two Muslim professors, Ibrahim Ekaidi and Bashir Atteia, were removed from the committee for improperly sharing candidate evaluations and submitting nearly identical feedback.[2]

---

[2] Ekaidi filed a lawsuit in this Court alleging several claims of employment discrimination related to his removal from the search committee. This Court granted SUNO's motion for summary judgment on Ekaidi's Title VII claim, finding in part

5

Following Ekaidi and Atteia's removal from the committee, the scores of the remaining professors were tabulated, and twelve candidates were ranked. *See* R. Doc. No. 20, Exhibit J. Abdelmageed and Ansari placed third and second, respectively. The committee recommended both for an interview.

The hiring committee scores and recommendations were then submitted to the department chair, Murty Kambhampati, who proceeded to conduct a second, independent review of the candidates. Kambhampati evaluated the candidates based on their letters of interest; letters of recommendation; academic transcripts; curricula vitae; and field of specialty. Kambhampati assigned numeric scores ranging from one to five for each category and ranked the candidates based on the totals. *See* R. Doc. No. 20, Exhibit E. In this ranking, Abdelmageed and Ansari placed fifth and sixth, respectively. Interviews were extended to James Bolton, Mark Chee, Olabisi Ojo, and Tristan Kimbrell—the four individuals ranked highest by Kambhampati. R. Doc. 20, Exhibits E & P. Abdelmageed and Ansari were not interviewed or hired. Bolton, Ojo, and Kimbrell were ultimately recommended to SUNO's chancellor for hire. R. Doc. No. 20, Exhibit Y.

Abdelmageed and Ansari allege that this hiring process resulted in unlawful discrimination against them. SUNO denies any discriminatory intent and avers that its hiring practices were "thorough, fair, and well-documented." R. Doc. No. 20, at 4.

---

that SUNO had put forth a legitimate, non-discriminatory reason for removing Ekaidi from the search committee and that Ekaidi had failed to show that reason to be pretextual. *Ekaidi v. Bd. of Supervisors of the S. Univ. Sys.*, No. 16-7523, 2017 WL 699821 (E.D. La. Feb. 22, 2017).

The Court concludes that, although Abdelmageed and Ansari can establish a prima facie case of discrimination, SUNO has explained its hiring decisions with legitimate, non-discriminatory reasons, which Abdelmageed and Ansari have failed to sufficiently refute. SUNO is, therefore, entitled to summary judgment on Abdelmageed and Ansari's claims.

Abdelmageed and Ansari can demonstrate a prima facie case of discrimination with respect to SUNO's mid-2014 hiring practices. Both men are Muslim. Both were qualified for the teaching positions to which they applied. Both were rejected for the positions, and the positions were filled by non-Muslim candidates.[3]

The burden, therefore, shifts to SUNO to produce a legitimate, non-discriminatory reason for rejecting Abdelmageed and Ansari. SUNO has done so. SUNO explains that Abdelmageed and Ansari were not recommended for interview or hire for reasons stemming from Kambhampati's "comprehensive assessment of each candidate's strengths and weaknesses against the needs of the department." *See* R. Doc. No. 20, at 7.

To justify Kambhampati's scores and ranking, SUNO cites the needs of the department and specific deficiencies in Abdelmageed and Ansari's applications. R. Doc. 20, at 8–11. At the time Abdelmageed and Ansari applied, the department required additional instructors in the field of zoology, as opposed to botany. This is reflected at several points throughout the record. *See, e.g.*, R. Doc. No. 23, Exhibit 4

---

[3] Abdelmageed and Ansari assert that they were the "only two Muslim job candidates" considered as part of the mid-2014 hiring process. R. Doc. No. 23, at 12. SUNO does not dispute this. *See* R. Doc. No. 20.

(advertising position and inviting applications for "Assistant Professor, Biology–Cell Biology, Animal Diversity or Genetics"); R. Doc. No. 20, Exhibit C (noting retirement of Laura Hardester, who taught animal diversity courses in the department, as well as a lack of pressing need for botanists), Exhibit E (reflecting higher marks for applicants specializing in zoology, genetics, molecular biology, cell biology, and immunology), Exhibit K (asserting lack of need for botanists), Exhibit Y (making special note in letter to chancellor recommending Kimbrell for hire that the department would be "blessed with a Ph.D. in Zoology or Animal Diversity").

Ansari, however, was considered a botanist, and Abdelmageed's specialty was marked as "zoology – not clear." R. Doc. No. 20, Exhibit E. Accordingly, Kambhampati gave Ansari a score of two for the specialty category, while Abdelmageed received a score of four. *Id.* Additionally, Abdelmageed and Ansari submitted incomplete transcripts, resulting in a loss of points in Kambhampati's scoring. *Id.*; R. Doc. No. 20, Exhibit M. As a result, in Kambhampati's evaluation, Abdelmageed and Ansari ranked fifth and sixth out of twelve applicants for three open positions. Thus, neither Abdelmageed nor Ansari was offered an interview or employment.

Because such an outcome is supported by legitimate, non-discriminatory justifications, the burden shifts back to Abdelmageed and Ansari to refute SUNO's proffered reasons. They may carry this burden by demonstrating disparate treatment or by showing SUNO's reasons to be false or unworthy of credence. They have done neither.

8

Abdelmageed and Ansari assert "that they have received disparate treatment by being effectively dropped from further consideration, at the time when their co-religionists [Ekaidi] and [Attiea] were eliminated as members of the hiring committee by a fiercely angry committee chair and departmental chair." R. Doc. No. 23, at 9. This contention finds little support in the record.

Abdelmageed and Ansari point to two emails to support their claim. In the first email, dated May 15, 2014, department chair Kambhampati wrote to hiring committee chair Joseph Omojola: "I request you to remove [Ekaidi and Atteia's] scores from the summary calculations and also remove the applicants names from the search process." R. Doc. No. 23, Exhibit 6. In the second email, dated May 16, 2014, Omojola wrote to Atteia: "Your action has resulted in a faculty member copying another. This is plagiarism, plain and simple . . . This is a grave mistake. I hope you learn from it as the candidates you hope to help will be adversely affected." R. Doc. No. 23, Exhibit 21. Abdelmageed and Ansari posit that these emails, paired with their failure to receive interviews, demonstrate "that the angry dictates of [Kambhampati and Omojola] were followed" and that they did not receive fair consideration after their fellow Muslims were expelled from the hiring committee. *See* R. Doc. No. 23, at 12.

The record indicates, however, that Abdelmageed and Ansari continued to be evaluated after Ekaidi and Attiea were removed from the committee. Despite Kambhampati's request that Abdelmageed and Ansari be removed from the search process, their composite scores were computed and included in the hiring committee's

9

final tabulation, which was sent to Kambhampati on May 16, 2017. R. Doc. No. 20, Exhibit J. Abdelmageed and Ansari do not dispute this. In fact, they rely on this tabulation to support their discrimination claims. *See* R. Doc. No. 23, at 12. They further state "that there has been no suggestion by anyone that [the hiring committee] rankings were tainted in any way." *Id.*

Additionally, Kambhampati himself included Abdelmageed and Ansari in his independent review and incorporated their scores in the report he sent to the dean on June 9, 2014. R. Doc. No. 20, Exhibit E. That report shows that Kambhampati gave Abdelmageed and Ansari favorable scores in several categories, ultimately placing them ahead of six other candidates. Accordingly, Abdelmageed and Ansari cannot seriously contend that they were eliminated from consideration upon Ekaidi and Attiea's departure from the hiring committee. Their disparate treatment claim, therefore, fails.

Likewise, Abdelmageed and Ansari have failed to offer substantial evidence showing that SUNO's proferred reasons for failing to hire them are false or unworthy of credence. Abdelmageed and Ansari do not directly contest the results of Kambhampati's review. They do not challenge the low marks they were given for providing deficient transcripts. *See* R. Doc. No. 23. Nor do they dispute that the department was in need of zoologists. *Id.* Instead, they maintain that it was inappropriate for Kambhampati, as chair of the department, to conduct any independent assessment at all. *See id.*, at 2, 13.

SUNO argues that Kambhampati's evaluation of the candidates was proper, noting that "at this stage of the hiring, and before candidates are interviewed, the Department Chair must move beyond general academic and teaching qualifications and inject into the process a sense of how each candidate meets the specific, present needs of the department." R. Doc. No. 20, at 7. Abdelmageed and Ansari contend that review by the department chair is "contradicted by published university policy." R. Doc. No. 23, at 13. Specifically, they point to the SUNO faculty handbook, which governs the appointment procedures for full-time faculty. R. Doc. No. 23, Exhibit 22. The handbook provides that "[a]fter a thorough discussion of the credentials and assessment statements with committee members, the Chairperson of the Search Committee, on behalf of the committee, shall recommend to the Vice Chancellor for Academic Affairs not less than three persons (without ranking) to fill the position." *Id.* This language, Abdelmageed and Ansari suggest, shows that "for reasons of SUNO policy, the departmental head is supposed to play no particular defined role in the selection of academic staff." R. Doc. No. 23, at 13.

Yet, even assuming SUNO made a conscious decision to stray from some set university hiring policy, Abdelmageed and Ansari still fail to raise any genuine dispute of material fact as to whether SUNO's proffered reasons are false or unworthy of credence. As the Fifth Circuit has observed, an employer's "'disregard of its own hiring system does not of itself conclusively establish that improper discrimination occurred or that a nondiscriminatory explanation for an action is pretextual.'" *EEOC v. Texas Instruments, Inc.*, 100 F.3d 1173, 1182 (5th Cir. 1996) (quoting *Risher v.*

11

*Aldridge*, 889 F.2d 592, 597 (5th Cir. 1989)). There must be some "nexus between the employment actions taken by the employer and the employee's [status]." *See id.* (quoting *Moore v. Eli Lilly & Co.*, 990 F.2d 812, 819 (5th Cir. 1993)). Abdelmageed and Ansari have demonstrated no such nexus here.

Other than their bald assertion that Kambhampati "carefully recorded his purely subjective evaluations of the two Muslim candidates" so as to ensure that they would remain "safely out of the running," Abdelmageed and Ansari offer no evidence that SUNO departed from its stated hiring policy in order to discriminate against Muslim applicants. *Cf. Blow v. City of San Antonio*, 236 F.3d 293 (5th Cir. 2001) (reversing a district court's grant of summary judgment where the plaintiff put on substantial evidence of the defendant's hiring practices to demonstrate that the defendant's employee, knowing that the plaintiff would receive preference in hiring, deviated from set hiring practices with the intent to discriminate by concealing a job opening and discouraging the plaintiff from applying before quickly interviewing and hiring someone else). Abdelmageed and Ansari, therefore, cannot rely on SUNO's hiring process to establish pretext.

Finally, Abdelmageed and Ansari attempt to show that SUNO's proffered reasons are false or unworthy of credence by comparing their qualifications to those of Kimbrell, who was "ranked only seventh" by the hiring committee. R. Doc. No. 23, at 15–16.[4] The Fifth Circuit has long held that "[a] fact finder can infer pretext if it

---

[4] Interestingly, Abdelmageed and Ansari offer no comparison of their qualifications to those of Bolton, Chee, or Ojo, the other three candidates who received interviews.

finds that the employee was 'clearly better qualified' (as opposed to merely better or as qualified) than the employees who are selected. *EEOC v. Louisiana Office of Cmty. Services*, 47 F.3d 1438, 1444 (5th Cir. 1995).

Abdelmageed and Ansari place great emphasis on the lengths of their applications and curricula vitae as compared to Kimbrell's. R. Doc. No. 23, at 15–16. They also cite their extensive teaching experience, grant-writing success, and other credentials. *Id.* These factors, they suggest, demonstrate that they were superior to Kimbrell, whose curriculum vitae is only one and a half pages. *Id.*

However, for a plaintiff to show pretext by establishing that he is clearly better qualified, "disparities in qualifications must be of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines v. Texas Dept. of Protective and Regulatory Services*, 164 F.3d 277, 280–81 (5th Cir. 1999). The Court is not persuaded that such disparities exist in this case.

It is true that Abdelmageed and Ansari's curricula vitae each listed more publications and teaching experience than Kimbrell's. But it is also true that Kimbrell offered a doctorate in zoology, which Abdelmageed and Ansari did not. This particular qualification appears to have weighed significantly in Kimbrell's favor. In a letter to SUNO's chancellor recommending Kimbrell for hire, the vice chancellor for academic affairs noted, "Since Dr. Hardester retired, this is the first time we are blessed with a Ph.D. in Zoology or Animal Diversity." R. Doc. No. 20, Exhibit Y. Notably, this observation is consistent with SUNO's overall claim that it made its

13

hiring decisions based on the needs of the department at the time. A reasonable and impartial person, then, could have chosen Kimbrell for one of the three open positions. Consequently, Abdelmageed and Ansari have not established that they were clearly better qualified, and no inference of pretext arises from their comparison of themselves to Kimbrell.

Abdelmageed and Ansari offer no further evidence indicative of pretext. Accordingly, they have failed to raise a genuine dispute of material fact as to the veracity of SUNO's legitimate, non-discriminatory reasons for failing to hire them. Summary judgment on their claims is, therefore, appropriate.

**B.**

Not long after SUNO completed its mid-2014 hiring process, Kimbrell resigned. Thereafter, SUNO conducted another search, which began in late 2014 and extended into early 2015. Ansari applied again. Abdelmageed did not.

This time, Ansari was one of three finalists, along with Jeanine Burse and John-Clifford Obih. R. Doc. No. 20, Exhibit Q. The candidates were interviewed and scored by the hiring committee. Seven members of the committee participated in Ansari's interview, compared to 10 for Burse and 11 for Obih. The committee found all three candidates to be suitable, and it awarded Burse a composite score of 46.4, Ansari a score of 43.9, and Obih a score of 43.3.

The candidates were next interviewed and rated by Omojola, who at the time was acting chair of the department. R. Doc. No. 20, Exhibit X. Omojola awarded Burse a score of 9.5, Obih a score of 9.1, and Ansari a score of 8.9. Like the committee,

14

Omojola found all three candidates suitable for employment, as he indicated when he transmitted his scores and the scores of the committee to the dean.

Burse was ultimately offered a position but turned it down. SUNO then offered the position to Obih. Ansari was not hired and now alleges that this process was discriminatory. SUNO insists that its process was fair.

Ansari can demonstrate a prima facie case of discrimination with respect to SUNO's hiring practices in late 2014 and early 2015. As previously noted, Ansari is Muslim. He was qualified for the teaching position to which he applied. He was rejected for the position, and the position was filled by a non-Muslim.[5]

Thus, SUNO must once more carry the burden of producing a legitimate, non-discriminatory reason for its hiring decisions. As before, SUNO has done so. In particular, SUNO cites "the Department's need for expertise in zoology and emphasis on quality teaching" to justify its selection of Obih over Ansari. R. Doc. No. 20, at 15. This explanation is plausible, considering the resignation of Kimbrell, who had taught zoology and animal diversity courses during his short tenure at SUNO. R. Doc. No. 20, Exhibit B. It is also consistent with SUNO's proffered reasons for hiring Kimbrell in the first place. As previously discussed, SUNO claims that Kimbrell was hired over Abdelmageed and Ansari, in part, because the department needed a zoologist. Hence, when Kimbrell resigned, SUNO hired Obih, another zoologist, over Ansari, who was more of a botanist. SUNO also cites what it perceived to be Obih's

---

[5] R. Doc. No. 23, Exhibit 2 (asserting that Obih is a Christian), Exhibit 28 (Obih referencing his involvement with the African Christian Fellowship).

15

superior teaching experience as a reason he was hired. R. Doc. No. 20, at 14. Such justifications are sufficient to meet SUNO's burden of production.

It falls to Ansari, then, to contest SUNO's proffered reasons. Again, this burden has not been carried. Ansari attempts to establish pretext in several ways. All are insufficient.

First, Ansari complains that he was given less time to interview than the candidate that interviewed before him. R. Doc. No. 23, at 16. He also claims that he was not allowed to meet with the chair of the department, the dean, or the vice-chancellor for academic affairs, despite the fact that such appointments appeared on the itinerary given to him by SUNO. *Id.* Ansari admits, however, that he had the chance to meet with Omojola, who at the time was serving as acting chair of the department while Kambhampati was out of the country. R. Doc. No. 26, Exhibit 2. He also admits that he met with the dean, though he claims he was told that the vice chancellor was out of the country and unable to meet. *Id.*

In any event, Ansari fails to explain how the circumstances surrounding his interview process give rise to an inference of discrimination sufficient to refute SUNO's legitimate, non-discriminatory reasons for failing to hire him. Ansari does not argue that the shorter interview left him with insufficient time to present his credentials. Nor does he contend that Burse or Obih received preferential treatment in their meetings with university leadership. Further, he offers no evidence to suggest that his interview was shortened or that he was denied meetings because he was Muslim. What he does offer is a seeming belief that his interview process was

16

unfair and, thus, discriminatory. But, in cases such as these, a "'subjective belief of discrimination' alone is not sufficient to warrant judicial relief." *Bauer*, 169 F.3d at 967.

Second, Ansari challenges Obih's qualifications. R. Doc. No. 23, at 17. He emphasizes that Obih had not taught at a university from 2005–2015. *Id.* He further notes that, at the time he applied to SUNO, Obih had not been published in 20 years. *Id.*

Nevertheless, Ansari has failed to reveal disparities of "such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question." *Deines*, 164 F.3d at 280–81. Though Obih was absent from teaching for an extended period, he was conducting relevant research at a local university during that time, R. Doc. No. 20, Exhibit R, and he had developed significant teaching experience in the years prior. *See* R. Doc. No. 23, Exhibit 18. Additionally, Obih specializes in physiology, a sub-topic of zoology. *See id.* Thus, a reasonable person could have selected him to fill the open position, given his prior experience and the department's need for a zoologist. Ansari, therefore, cannot show pretext by establishing that he was clearly better qualified.

Third, Ansari points to Obih's personal acquaintance with hiring committee chair Joseph Olubadewo. R. Doc. 23, at 17. He appears to suggest that Obih may have received some sort of improper advantage considering his and Olubadewo's "mutual long-time membership in an organization styled the African Christian

17

Fellowship." *Id.* This personal relationship is insufficient to show that SUNO's non-discriminatory reasons are false or unworthy of credence. *See Criner v. Texas–New Mexico Power Co.*, 470 Fed. App'x 364, 370 (5th Cir. 2012) (finding, in part, that the fact a member of the interview panel shared a friendship with the successful applicant and suggested he apply was inadequate to show the employer's legitimate, non-discriminatory reasons for its hiring decision were false or unworthy of credence). A hiring decision based partly on personal affiliations with an applicant does not necessarily equate to intentional discrimination that runs afoul of Title VII. Moreover, Olubadewo was only one of seven committee members to interview and score Ansari at one of multiple levels of the hiring process. Even assuming Olubadewo gave preference to Obih, it appears to have had little effect, as Ansari still received a higher composite score from the hiring committee.

Finally, Ansari states that "in 2015, SUNO declared an 'emergency' and shortly after hired an entirely inexperienced Nigerian [Christian][6] woman to fill the job which [Ansari] applied for." R. Doc. No. 23, at 17. He asserts that Oluwaseun Ogunsakin, who has no doctoral degree, no publications, and no teaching experience, was hired to fill an open, tenure-track position. *Id.* This claim is entirely unsupported by the record.

Ogunsakin was recommended for hire by SUNO. R. Doc. No. 20, Exhibit F, However, she was chosen to fill a temporary position that arose when Bolton unexpectedly turned down his offer of employment in August of 2014, just before the

---

[6] R. Doc. No. 23, at 13.

18

start of classes. *See id.* She was not considered for either of the positions to which Ansari applied. Indeed, SUNO "has not and does not contend that [she] was more qualified for a tenure-track position than Ansari." R. Doc. No. 20, at 7. Ogunsakin's employment, therefore, has absolutely no bearing on Ansari's claim, which challenges SUNO's search for a full-time, tenure-track professor in late 2014 and early 2015.

Ultimately, Ansari has failed to show that SUNO's legitimate, non-discriminatory reasons for failing to hire him are pretextual. And even if he had made such a showing, he would at most create "a weak issue of fact as to whether the employer's reason was untrue" in a situation where "there [is] abundant and uncontroverted evidence that no discrimination occurred." *Laxton*, 333 F.3d at 579. In either instance, summary judgment is appropriate.

## VI.

Finally, the complaint makes reference to "the relevant laws of the state of Louisiana" and "applicable state law." R. Doc. 1, at 1 and 5 ¶ 13. However, it fails to identify a particular cause of action arising under state law. Likewise, plaintiffs' briefing in response to the defendant's motion is void of any discussion of state law claims. Accordingly, the unidentified state law claims are waived and will be dismissed.

## VII.

Construing all facts and inferences in favor of the non-moving party, the Court concludes that, though the plaintiffs have established prima facie cases of discrimination, the defendant has proffered legitimate, non-discriminatory reasons

19

for its actions, and the plaintiffs have failed to raise a genuine dispute of material fact as to the veracity of those reasons. "A decision as to whether judgment as a matter of law is appropriate . . . turns on 'the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law.'" *Laxton*, 333 F.3d at 579. In this case, the strength and consistency of SUNO's proffered reasons for its hiring decisions compel the Court to conclude that the plaintiffs' Title VII claims cannot survive summary judgment.

Accordingly,

**IT IS ORDERED** that the defendant's motion for summary judgment is **GRANTED** and all of the plaintiffs' claims are **DISMISSED WITH PREJUDICE**.

New Orleans, Louisiana, September 8, 2017.

_____
**LANCE M. AFRICK
UNITED STATES DISTRICT JUDGE**